## ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 19-5104

---

PHYSICIANS FOR SOCIAL RESPONSIBILITY, *et al.*,
*Appellants*,

v.

ANDREW WHEELER, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, IN HIS OFFICIAL CAPACITY,
*Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:17-CV-02742-TNM (THE HON. TREVOR N. MCFADDEN)

---

## PROOF OPENING BRIEF OF APPELLANTS

**DATED:    August 15, 2019**

Michael Burger
Special Counsel
Columbia Environmental Law Clinic
Morningside Heights Legal Services
435 W. 116th St.
New York, NY 10027
(212) 854-2374
mburger@law.columbia.org

*Counsel for Appellants Joe Árvai and
Robyn Wilson*

Neil Gormley
Tosh Sagar
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
ngormley@earthjustice.org
tsagar@earthjustice.org

*Counsel for Appellants Physicians for
Social Responsibility, National
Hispanic Medical Association,
International Society for Children's*

*Health and the Environment, and*
*Edward Lawrence Avol*

Patti Goldman
Earthjustice
705 Second Avenue
Suite 203
Seattle, WA 98104
(206) 343-7340
pgoldman@earthjustice.org

*Counsel for Appellants Physicians for*
*Social Responsibility, National*
*Hispanic Medical Association,*
*International Society for Children's*
*Health and the Environment, and*
*Edward Lawrence Avol*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| PHYSICIANS FOR SOCIAL RESPONSIBILITY, *et al.*, <br><br> *Appellants*, <br><br> v. <br><br> ANDREW WHEELER, Administrator, U.S. Environmental Protection Agency, in his official capacity, <br><br> *Appellee*. | No. 19-5104 |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 27(a)(4), Physicians for Social Responsibility, National Hispanic Medical Association, International Society for Children's Health and the Environment, Edward Lawrence Avol, Joe Árvai, and Robyn Wilson ("Appellants") submit this certificate as to parties, rulings, and related cases.

### (A) Parties and *Amici*

#### (i) Parties, Intervenors, and *Amici* Who Appeared in the District Court

Appellants appeared as plaintiffs, and Andrew Wheeler appeared as defendant in the district court proceeding.

#### (ii) Parties to This Case

<u>Appellant</u>:

The appellants in the above-captioned case are Physicians for Social

Responsibility, National Hispanic Medical Association, International Society for Children's Health and the Environment, Edward Lawrence Avol, Joe Árvai, and Robyn Wilson.

Appellee:

The appellee in the above-captioned case is Andrew Wheeler, in his official capacity as Administrator of the EPA.

Intervenors:

None at present.

**(iii) *Amici* in This Case**

Former government officials Lynn R. Goldman, Bernard Goldstein, David Michaels, Kenneth Olden, Bob Perciasepe, and Terry Yosie filed a notice of intent to file an amicus brief in support of plaintiffs-appellants on July 31, 2019.

**(iv) Circuit Rule 26.1 Disclosures**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Appellants make the following disclosures:

## PHYSICIANS FOR SOCIAL RESPONSIBILITY

Non-Governmental Corporate Party to this Action: Physicians for Social Responsibility ("PSR").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

<u>Party's General Nature and Purpose</u>: PSR is a corporation organized and existing under the laws of Massachusetts. It is a national nonprofit organization of medical and public health professionals and lay advocates dedicated to promoting peace, strengthening public health and child health, and supporting environmental integrity.

## NATIONAL HISPANIC MEDICAL ASSOCIATION

<u>Non-Governmental Corporate Party to this Action</u>: National Hispanic Medical Association ("NHMA").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: NHMA is a nonprofit organization with its principal place of business in Washington, DC. NHMA's mission is to empower Hispanic physicians and health care professionals to lead efforts to improve the health of Hispanic and other underserved populations, which it achieves by working in collaboration with Hispanic state medical societies, residents, medical students, and other public and private sector partners.

## INTERNATIONAL SOCIETY FOR CHILDREN'S HEALTH AND THE ENVIORNMENT

<u>Non-Governmental Corporate Party to this Action</u>: International Society for Children's Health and the Environment ("ISCHE").

<u>Parent Corporations</u>: None.

v

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: ISCHE is a nonprofit organization, organized and existing under the laws of the State of Delaware, of professional scientists that works to promote children's health by addressing the unique vulnerabilities of children to pollutants. ISCHE promotes research into the threats children face from environmental hazards and measures to protect them from those hazards.

**(B) Rulings Under Review**

Appellants seek review of the Order and Memorandum Opinion granting Defendant's Motion to Dismiss. Order & Memorandum Opinion, *Physicians for Social Responsibility v. EPA*, No. 17-2742, ECF No. 44, 43 (D.D.C. Feb. 12, 2019).

**(C) Related Cases**

1. Union of Concerned Scientists and Elizabeth Anne Sheppard v. Andrew Wheeler, 377 F. Supp. 3d 34 (D. Mass. 2019), *appeal docketed*, No. 19-1383 (1st Cir. Apr. 23, 2019).

2. Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency et al., No. 19-cv-5174 (S.D.N.Y. filed June 3, 2019).

DATED:    August 15, 2019              Respectfully submitted,

/s/ Michael Burger (w/permission)     /s/ Neil Gormley
Michael Burger                        Neil Gormley
Special Counsel                       Tosh Sagar

Columbia Environmental Law Clinic
Morningside Heights Legal Services
435 W. 116th St.
New York, NY 10027
(212) 854-2374
mburger@law.columbia.org

*Counsel for Appellants Joe Árvai and
Robyn Wilson*

Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
ngormley@earthjustice.org
tsagar@earthjustice.org

Patti Goldman
Earthjustice
705 Second Avenue
Suite 203
Seattle, WA 98104
(206) 343-7340
pgoldman@earthjustice.org

*Counsel for Appellants Physicians for
Social Responsibility, National
Hispanic Medical Association,
International Society for Children's
Health and the Environment, and
Edward Lawrence Avol*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................x

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ xvi

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATUTES AND REGULATIONS.........................................................4

ISSUES PRESENTED.........................................................................4

STATEMENT OF THE CASE................................................................6

    A.    The Critical Role of EPA's Scientific Advisory Committees. .............6

    B.    Uniform Ethics Rules Allow Agency Grantees To Serve On Scientific Advisory Committees As Long As They Recuse Themselves In the Rare Instance that the Committee Addresses Their Research Funding. ...................................................................................................8

        a)    The Uniform Executive-Branch Ethics Rules ............................. 9

        b)    The Uniform Ethics Rules Are Independently Binding on EPA in its Use of Advisory Committees................................................. 11

        c)    The Uniform Ethics Rules Govern Conflicts of Interest for Scientific Advisory Committee Members.................................. 12

    C.    EPA's Longstanding Policy, In Keeping With the Uniform Rules, Of Allowing Scientists Who Conduct EPA-Funded Research To Serve on Scientific Advisory Committees. .......................................................14

    D.    The Directive Reverses Longstanding EPA Policy. ..........................16

    E.    Dismissal of Scientists. ......................................................................18

    F.    District Court Proceedings. .................................................................19

SUMMARY OF ARGUMENT ..............................................................21

STANDARD OF REVIEW ...................................................................24

ARGUMENT .....................................................................................26

I.    EPA VIOLATED FEDERAL ETHICS LAW BY ADOPTING A CONFLICT-OF-INTEREST RULE INCONSISTENT WITH THE UNIFORM ETHICS RULES ISSUED BY THE ETHICS OFFICE FOR THE EXECUTIVE BRANCH. ................................................................26

    A. The Directive Is Inconsistent with the Uniform Ethics Rules.................26

B.      Federal Ethics Laws Mandate Uniformity ..........................................30

C.      The Ethics Rules and the Directive Apply to Committee Appointments and the Financial Interests of Members. ....................34

II.    EPA'S CONFLICT-OF-INTEREST RULE IS PROCEDURALLY DEFECTIVE. .................................................................................39

A.      EPA Violated Federal Ethics Law by Promulgating a Conflict-of-Interest Rule Without Consulting the Ethics Office or Observing Required Procedures. ..........................................................................39

B.      Judicial Review of Whether EPA Acted in Violation of Required Procedures Is Not Precluded by an Ethics Office Regulation. ..........42

III.   EPA'S REVERSAL IN POLICY IS ARBITRARY AND CAPRICIOUS. ...........................................................................46

A.      EPA Failed to Consider The Ethics Office's Determination That Agency Grants Should Not Disqualify Scientists from Scientific Advisory Committee Service. .........................................................46

B.      EPA Failed to Consider The Risk that Barring EPA-Funded Scientists From Its Scientific Advisory Committees Will Impair Its Ability to Recruit Needed Expertise..................................................................47

C.      EPA Failed to Acknowledge Its Own Prior Policy or Address the Reasons for it...................................................................................50

IV.    THE DIRECTIVE IS REVIEWABLE, NOT COMMITTED TO AGENCY DISCRETION BY LAW.....................................................53

CONCLUSION ....................................................................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................59

CERTIFICATE OF SERVICE ..............................................................60

ix

# TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE(S)**

*Air Transport Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999)..............................................................45

*Archdiocese v. WMATA*,
  897 F.3d 314 (D.C. Cir. 2018)...........................................................41

* *Ball, Ball & Brosamer v. Reich*,
  24 F.3d 1447 (D.C. Cir. 1994)......................................................44, 45

*Bennett v. Spear*,
  520 U.S. 154 (1997)..........................................................................43

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002)...............................................24, 36, 50

*Cablevision Sys. Corp. v. FCC*,
  649 F.3d 695 (D.C. Cir. 2011)...........................................................52

* *CBS Corp. v. FCC*,
  785 F.3d 699 (D.C. Cir. 2015)...............................................51, 52, 53

*CC Distribs., Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989)...........................................................54

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)..........................................................................54

*Cohen v. Bd. of Trustees of the Univ. of the D.C.*,
  819 F.3d 476 (D.C. Cir. 2016)...........................................................24

*Council for Urological Interests v. Sebelius*,
  668 F.3d 704 (D.C. Cir. 2011)...........................................................44

* *De Jesus Ramirez v. Reich*,
  156 F.3d 1273 (D.C. Cir. 1998)....................................................44, 45

*\* Authorities upon which we chiefly rely marked with asterisks*

x

\* *Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)................................................................55, 57

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009)..................................................50

*Doe v. U.S. Dep't of Justice*,
    753 F.2d 1092 (D.C. Cir. 1985)..................................................24

*Encino Motorcars v. Navarro*,
    136 S. Ct. 2117 (2016)................................................................26

*Erickson v. Pardus*,
    551 U.S. 89 (2007)................................................................24, 36

\* *FCC v. Fox Television Stations*,
    556 U.S. 502 (2009)..............................................25, 26, 50, 52

*Gordon v. Gouline*,
    81 F.3d 235 (D.C. Cir. 1996)......................................................25

*Harris v. D.C. Water & Sewer Auth.*,
    791 F.3d 65 (D.C. Cir. 2015)......................................................24

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)..........................................................25, 45

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004)....................................................................25

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013)....................................................8

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................25, 47, 50

*Mountain Commc'ns, Inc. v. FCC*,
    355 F.3d 644 (D.C. Cir. 2004)....................................................25

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013)....................................................53

xi

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) .......................................................52

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988) .........................................................55

*New York Cross Harbor R.R. v. Surface Transp. Bd.*,
   374 F.3d 1177 (D.C. Cir. 2004) .......................................................46

*Pacific Gas & Elec. Co. v. FERC*,
   306 F.3d 1112 (D.C. Cir. 2002) .......................................................47

*PanAmSat Corp. v. FCC*,
   198 F.3d 890 (D.C. Cir. 1999) .........................................................49

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
   139 S. Ct. 2051 (2019) ....................................................................45

*Public Citizen v. National Advisory Committee on Microbiological
   Criteria for Foods*,
   886 F. 2d 419 (D.C. Cir. 1989) .......................................................56

*Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*,
   707 F.3d 371 (D.C. Cir. 2013) .........................................................51

*Siegel v. SEC*,
   592 F.3d 147 (D.C. Cir. 2010) .........................................................25

*U.S. Dep't of State v. Coombs*,
   482 F.3d 577 (D.C. Cir. 2007) .........................................................47

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ........................................................................25

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) ................................................................43, 55

## STATUTES

5 U.S.C. App. 2, § 5(b)(2) ...................................................................48

5 U.S.C. App. 2 § 7(c) ........................................................................11

5 U.S.C. App. 4 § 401 *et seq.*..................................................................44

\* 5 U.S.C. App. 4 § 402...............................9, 10, 27, 32, 34, 37, 39, 40, 45

5 U.S.C. App. 4 § 404 ...............................................................................45

5 U.S.C. § 701 ....................................................................................42, 54

5 U.S.C. § 702 ...........................................................................................42

5 U.S.C. § 703 ...........................................................................................42

5 U.S.C. § 704 .....................................................................................24, 42

5 U.S.C. § 705 ...........................................................................................42

5 U.S.C. § 706 ...........................................................................24, 42, 45, 57

7 U.S.C. § 136w(d) ................................................................................7, 48

15 U.S.C. § 2625(i) ...............................................................................6, 48

15 U.S.C. § 2625(h) ..............................................................................6, 48

18 U.S.C. § 201 *et seq* ..............................................................................9

\* 18 U.S.C. § 208 .......................................................................9, 10, 32, 38, 49

28 U.S.C. § 1291 .........................................................................................4

28 U.S.C. § 1331 .........................................................................................4

42 U.S.C. § 4365(b) ..............................................................................7, 48

42 U.S.C. § 7408(a)(2) ..........................................................................6, 48

42 U.S.C. § 7409 ...............................................................................6, 7, 48

## LEGISLATIVE HISTORY

S. Rep. No. 87-2213 (1962) ...................................................................9, 32

S. Rep. No. 95-170 (1977) ........................................................................33

H.R. Rep. No. 101-362 (1989)....................................................................34

## REGULATIONS

* 5 C.F.R. § 2635.105................................................................11, 17, 39, 43

5 C.F.R. § 2635.105(a)(2)......................................................................40

5 C.F.R. § 2635.106(c)...........................................................................43

5 C.F.R. § 2635.402...............................................................................29

5 C.F.R. § 2635.402(b)(1)................................................................12, 29

5 C.F.R. § 2635.402(b)(3)................................................................12, 28

5 C.F.R. § 2635.402(c)..........................................................12, 13, 28, 29

5 C.F.R. § 2635.402(d)...........................................................................13

* 5 C.F.R. § 2638.602........................... 11, 17, 27, 31, 34, 39, 40, 42, 43

5 C.F.R. § 2640.101 ................................................................................9

5 C.F.R. § 2640.203(g) ..........................................................13, 29, 31, 38

41 C.F.R. part 102-3, subpt. C, App A .....................................12, 27, 35

41 C.F.R. § 102-3.60(b)(3) ...................................................................49

41 C.F.R. § 102-3.105(a) ......................................................................11

41 C.F.R. § 102-3.105(h) ............................................................12, 27, 35

41 C.F.R. § 102-3.130(a) ................................................................38, 55

## FEDERAL REGISTER NOTICES

28 Fed. Reg. 985 (Feb. 1, 1963) .......................................................32, 33

46 Fed. Reg. 2582 (Jan. 9, 1981) ..........................................................45

57 Fed. Reg. 35,006 (Aug. 7, 1992).......................................................10, 30, 31, 45

60 Fed. Reg. 47,208 (Sept. 11, 1995) ...................................................13, 14, 29, 38

61 Fed. Reg. 50,689 (Sept. 27, 1996) ......................................................................30

61 Fed. Reg. 66,830 (Dec. 18, 1996).....................................................10, 30, 33, 34

66 Fed. Reg. 37,728 (July 19, 2001).......................................................................35

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of uncommon acronyms and abbreviations used in this brief.

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | United States Environmental Protection Agency |
| FAC | Plaintiffs' First Amended Complaint |

## INTRODUCTION

This case challenges an EPA directive (the "Directive") that disqualified recipients of EPA research grants from serving on scientific advisory committees that provide peer review of the science underlying EPA regulations and decisions. This Directive reversed EPA's longstanding policy of treating these grantees, who are predominantly academic scientists, as highly qualified and valuable members of its scientific advisory committees because of their expertise. Before the Directive, EPA heeded the uniform and binding conflict-of-interest rules issued by the Office of Government Ethics ("Ethics Office"), which establish a government-wide policy that recipients of federal research grants are eligible to serve on advisory committees as "special government employees" as long as they do not make recommendations on their own grants. Without consulting the Ethics Office—the agency Congress charged with setting government-wide ethics policies—or identifying any instances where the service of EPA grantees compromised the work of its scientific advisory committees, EPA abruptly abandoned its longstanding policy and issued the Directive barring EPA grantees from serving on its scientific advisory committees.

EPA immediately began applying the Directive by forcing scientists receiving EPA grant funding to choose between committee membership and their research funding. EPA removed EPA grantees from its advisory committees if they

1

declined to abandon their research and barred them from consideration for new appointments. As a result, the representation of academic experts on EPA's scientific advisory committees has dropped precipitously, depriving the committees—and EPA—of leading scientific expertise on critical public health and environmental decisions.

Scientists subject to the Directive brought suit claiming that the Directive violates federal ethics laws and regulations that establish substantive and procedural requirements that are binding on EPA and that the Directive is arbitrary and capricious.[1] EPA moved to dismiss on numerous grounds. The district court ruled for Scientists on standing, ripeness, and zone of interests, but dismissed all claims on grounds of nonreviewability or failure to state a claim. Dismissal of these claims was erroneous and requires reversal by this Court.

First, the Directive contravenes uniform ethics rules established by the Ethics Office establishing that the receipt of agency research grants is not a disqualification from service on scientific advisory committees. By statute and regulation, these rules apply to all federal agencies and establish "uniform"

---

[1] Plaintiff-Appellants are Physicians for Social Responsibility, National Hispanic Medical Association, International Society for Children's Health and the Environment, Edward Lawrence Avol, Joe Árvai, and Robyn Wilson (collectively, "Scientists").

2

standards, not mere "floors" or minimum standards, and EPA lacked authority to depart from them.

Second, EPA's unilateral adoption of contrary standards violated the requirement to obtain the Ethics Office's prior approval to issue an ethics related regulation and to use the supplemental regulation procedures established by regulation. EPA's violation of these procedural requirements is subject to judicial review because the Ethics Office regulations impose no limit on review of the "prior approval" requirement and the Ethics Office lacks statutory authority to preclude review of agencies' violations of the supplemental regulation requirement.

Third, in jettisoning the federal ethics rules as the guideposts for assessing conflicts of interests, EPA acted arbitrarily and capriciously. EPA failed even to consider the Ethics Office's determination that this financial interest should not be disqualifying, and failed to consider whether excluding EPA grantees will impair EPA's ability to recruit experts qualified to provide advice on complex scientific decisions. Additionally, EPA never acknowledged, let alone rationally explained, its abrupt departure from its own longstanding policy of allowing, and even encouraging, EPA grantees to serve on scientific advisory committees. Its vague claims that the Directive "strengthens" and "improves" the advisory committees wholly fail to grapple with this about-face.

3

Finally, all of Scientists' claims are reviewable under the Administrative Procedure Act ("APA"). The district court found ample law to apply and reached the merits of both the claim that the Directive violates the ethics rules and that it arbitrarily reverses EPA's longstanding practice. It was internally inconsistent and an impermissible expansion of a narrow exception to APA review for the court to conclude that Scientists' other claims that the Directive is arbitrary and capricious are committed to agency discretion by law.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Scientists' claims arise under the Administrative Procedure Act and other federal laws. Scientists timely noticed this appeal on April 12, 2019. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment of dismissal.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are in a separate addendum, along with Ethics Office Legal Advisory 11-07.

## ISSUES PRESENTED

1.      Did EPA violate federal ethics law by adopting a conflict-of-interest rule for special government employees serving on its scientific advisory committees that is inconsistent with the binding, uniform ethics standards

4

established for the executive branch by the Ethics Office pursuant to the Ethics in Government Act and adopted by the General Services Administration in its administration of the Federal Advisory Committee Act?

2.      Did EPA violate federal ethics law by adopting this conflict-of-interest rule without observance of required procedures that EPA concedes apply to its issuance of an ethics rule?

3.      Is judicial review under the Administrative Procedure Act of EPA's violation of required procedures precluded by language in an Ethics Office regulation when the regulation plainly does not encompass the requirement to obtain the Ethics Office's prior approval and, in any event, no statute authorizes the Ethics Office to preclude judicial review?

4.      Did EPA act arbitrarily and capriciously by abruptly deciding to disqualify EPA grantees from its scientific advisory committees without considering the contrary position of the Ethics Office, addressing the risk that excluding grantees will impair the expertise of the committees, acknowledging its own prior position, or rationally explaining the reversal?

5.      Is judicial review available of whether EPA's policy reversal was arbitrary and capricious, when federal ethics laws and regulations, the Federal Advisory Committee Act, and statutes establishing specific scientific advisory committees place limits on EPA's discretion?

5

## STATEMENT OF THE CASE

### A. The Critical Role of EPA's Scientific Advisory Committees.

To protect public health and the environment, many statutes direct EPA to ensure that its decisions are based on the best available science. For example, the Clean Air Act directs EPA to use the "latest scientific knowledge" in deciding whether its air quality standards are sufficiently protective of public health and the environment. 42 U.S.C. §§ 7408(a)(2), 7409(b). The Toxic Substances Control Act requires EPA's regulation of toxic chemicals to be "consistent with the best available science" and "based on the weight of the scientific evidence." 15 U.S.C. § 2625(h)-(i). Congress established and EPA utilizes scientific advisory committees to review the science underlying its regulatory decisions and provide advice to help ensure it is basing its action on the latest and best-available science.

EPA's scientific advisory committees thus play a critical role in assisting EPA in carrying out its statutory duties, advising the agency on scientific information central to its regulatory and policy decisions. FAC ¶ 19-21, JA____-__. While EPA currently manages approximately 22 advisory committees, FAC ¶ 16, JA____, only the subset that provide scientific peer review are the subject of this case, *see* Opp'n to Mot. to Dismiss at 1-2. Those scientific advisory committees provide independent, expert advice on a wide range of scientific and technical subjects, including air pollution, water pollution, pesticides,

6

epidemiology, risk assessment, and children's health. They advise on broad issues
of regional, national, and international scope, such as rulemakings and scientific
research, but not on EPA research grants, which are awarded through a separate
and highly competitive peer-review process. FAC ¶¶ 28-30, JA____. Some of the
scientific advisory committees are established by statutes that direct EPA to select
members based on their professional qualifications in specific scientific subjects.
*See* 7 U.S.C. § 136w(d) (Scientific Advisory Panel members "shall be selected on
the basis of their professional qualifications to assess the effects of the impact of
pesticides on health and the environment"); 42 U.S.C. § 4365(b) (Science
Advisory Board members "shall be qualified by education, training, and
experience to evaluate scientific and technical information on matters referred to
the Board under this section"); 42 U.S.C. § 7409(d)(2)(A) (the Clean Air Scientific
Advisory Committee must include "at least one member of the National Academy
of Sciences").

EPA's scientific advisory committees play a crucial role in ensuring the
scientific accuracy of EPA rules, reports, and findings. For example, in 2015, the
Scientific Advisory Board urged EPA to reconsider a draft EPA report due to
discrepancies between the executive summary's conclusion that EPA had found no
widespread, systemic impacts of fracking on drinking water, and the multiple
examples in the body of the report of contaminated community drinking water.

7

FAC ¶ 20, JA____. As an additional example, in 2008, EPA promulgated a rule lowering the primary national ambient air quality standard for ozone based, in large part, on a unanimous recommendation of the Clean Air Scientific Advisory Committee to lower the standard. A reviewing court upheld the lower standard in the face of an industry challenge based in part of the advisory committee's scientific analysis and recommendation. *Mississippi v. EPA*, 744 F.3d 1334 (D.C. Cir. 2013); FAC ¶ 21, JA____.

**B. Uniform Ethics Rules Allow Agency Grantees To Serve On Scientific Advisory Committees As Long As They Recuse Themselves In the Rare Instance that the Committee Addresses Their Research Funding.**

Scientists who serve on EPA's scientific advisory committees are "special government employees," subject to federal conflict-of-interest statutes and regulations. FAC ¶ 18, JA____; Mem. Ethics Office General Counsel to Designated Agency Ethics Officials Regarding Federal Advisory Committee Appointments at 4 (Aug. 18, 2005) (Opp'n to Mot. to Dismiss Ex. 2), JA____. In contrast, individuals who serve on other EPA advisory committees, most of which focus on policies, serve in a representative capacity and are not subject to the conflict-of-interest laws. *Id*. As described below, the ethics laws and regulations that govern scientists on scientific advisory committees allow recipients of agency grants to serve but require them not to advise on their grants.

8

### a)    The Uniform Executive-Branch Ethics Rules

The federal ethics statutes, 5 U.S.C. App. 4 & 18 U.S.C. §§ 201-209, as amended, are "intended to prevent an employee from allowing personal interests to affect his official actions, and to protect governmental processes from actual or apparent conflicts of interests." 5 C.F.R. § 2640.101. Enacted in part to address the problem of excessive and unnecessary ethics requirements that were viewed as an obstacle to government service, they strike a careful balance between avoiding conflicts of interest and ensuring that talented individuals can serve the government. S. Rep. No. 87-2213, at 6-7 (1962), *as reprinted in* 1962 U.S.C.C.A.N. 3852, 3856; FAC ¶¶ 72-73, JA____. *See* Mem. Op. at 10, JA___.

To that end, Congress established the Ethics Office to provide "overall direction of executive branch policies related to preventing conflicts of interest on the part of officers and employees of any executive agency." 5 U.S.C. App. 4 § 402(a). Congress directed the Ethics Office to issue "rules and regulations . . . pertaining to conflicts of interest and ethics" for the entire executive branch, in consultation with the Attorney General and the Office of Personnel Management, and interpret those rules and regulations. *Id.* App. 4 § 402(b)(1), (6). In addition, Congress directed the Ethics Office to issue "uniform regulations," in consultation with the Attorney General, defining financial interests that are "too remote or too inconsequential to affect the integrity of the services" of a federal officer or

9

employee and "provide guidance with respect to the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services." 18 U.S.C. § 208(d)(2)(B); *id.* § 208(b)(2). *See also* Executive Order 12731 § 201(a) (Ethics Office regulations "establish a single, comprehensive, and clear set of executive-branch standards of conduct").

Pursuant to these authorities, the Ethics Office has issued "uniform standards of ethical conduct for . . . the executive branch," codified at 5 C.F.R. parts 2635-41. 57 Fed. Reg. 35,006 (Aug. 7, 1992), JA____. *Accord* 61 Fed. Reg. 66,830 (Dec. 18, 1996), JA____. As the Department of Justice explains on its website, these standards of ethical conduct "replaced the many individual agency standard of conduct regulations with a uniform set of standards applicable to all employees of the executive branch."[2]

Congress also directed the Ethics Office to review other agencies' rules and regulations regarding conflicts of interest and ethical problems to ensure "such rules and regulations [are] consistent with and an effective supplement to the conflict of interest laws." 5 U.S.C. App. 4 § 402(b)(12). Pursuant to this authority, the Ethics Office requires all ethics-related regulations to be consistent with the uniform ethics rules and requires all agencies to obtain the Ethics' Office's prior

---

[2] U.S. Department of Justice, Summary of the Executive Branch Standards of Ethical Conduct, https://www.justice.gov/jmd/principles-ethical-conduct (visited August 13, 2019).

10

approval to issue such regulations. 5 C.F.R. § 2638.602. To adopt a supplemental

agency ethics rule, agencies must use the procedures specified in 5 C.F.R.

§ 2635.105, which require the concurrence and co-signature of the Ethics Office,

publication in the Federal Register, and codification the rule in the Code of Federal

Regulations.

>    **b)    The Uniform Ethics Rules Are Independently Binding on EPA in its Use of Advisory Committees.**

Not only do the uniform ethics rules bind other agencies by their own terms,

but the General Services Administration has made the uniform rules binding as

part of its administration of the Federal Advisory Committee Act ("Committee

Act"), which constrains EPA's discretion in establishing and utilizing federal

advisory committees. The General Services Administration is charged under the

Committee Act with issuing rules and regulations that are binding on other

agencies. 5 U.S.C. App. 2 § 7(c); 41 C.F.R. § 102-3.105(a).

At the request of the Ethics Office, the General Services Administration

made the conflict-of-interest and other ethical rules applicable to federal advisory

committees under the Committee Act. The Committee Act implementing

regulations direct agencies to "apply Federal ethics rules," through the designated

agency ethics official, to prospective members in the appointment process; provide

that committee members "are covered by" the Ethics Office regulations; and

11

require agency heads to review members' "interests and affiliations . . . for

conformance" with the regulations. 41 C.F.R. part 102-3, subpt. C, App A;

41 C.F.R. § 102-3.105(h).

### c)     The Uniform Ethics Rules Govern Conflicts of Interest for Scientific Advisory Committee Members.

Under the uniform ethics rules, a financial interest in an agency grant does

not disqualify an individual from government service. Individuals are disqualified

from participating only in the "particular matter" in which they have a financial

interest, if the matter will have "a direct and predictable effect on that interest."

5 C.F.R. § 2635.402(c). A potentially disqualifying matter is one that is focused on

the interests of specific people or discrete, identifiable classes of people, such as an

adjudicative proceeding, an application for a permit, a contract, or a criminal

charge. *Id.* § 2635.402(b)(3). It "does not extend to the consideration or adoption

of broad policy options that are directed to the interests of a large and diverse

group of persons." *Id.* A direct and predictable effect requires a "close causal link"

between the government action and the financial effect and a real, as opposed to a

"speculative possibility that the matter will affect the financial interest." *Id.*

§ 2635.402(b)(1).

The uniform ethics rules expressly address potential conflicts of interest that

may arise when a special government employee serves on a federal advisory

12

committee. They deem a financial interest "too remote or too inconsequential to affect an employee's services to the Government," 60 Fed. Reg. 47,208, 47,208 (Sept. 11, 1995), JA____, if "the matter will not have a special or distinct effect on the employee or employer other than as part of a class." 5 C.F.R. § 2640.203(g). An agency grant recipient is free to participate in such matters. *Id.*; *see also id.* § 2635.402(c), (d).

By providing illustrative examples, the rules clarify the distinction between a matter that has a distinct effect that presents a conflict of interest for a special government employee serving on a federal advisory committee, on the one hand, and a matter of general applicability that does not. 5 C.F.R. § 2640.203(g); 60 Fed. Reg. 47,208. They provide the following example of a broad policy that creates no conflict of interest: "A chemist employed by a major pharmaceutical company has been appointed to serve on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials involving human subjects. Even though the chemist's employer is in the process of developing an experimental AIDS vaccine and therefore will be affected by the new standards, the chemist may participate in formulating the advisory committee's recommendations." *Id.* at 47,231. In contrast, a conflict is present in the following situation that has a special effect on the individual's grant: "The National Cancer Institute (NCI) has established an advisory committee to evaluate a university's

13

performance of an NCI grant to study the efficacy of a newly developed breast

cancer drug. An employee of the university may not participate in the evaluation of

the university's performance because it is not a matter of general applicability." *Id.*

## C. EPA's Longstanding Policy, In Keeping With the Uniform Rules, Of Allowing Scientists Who Conduct EPA-Funded Research To Serve on Scientific Advisory Committees.

Under EPA's consistent, decades-long policies and practices, receipt of EPA

funding did not create a per se bar to service on EPA's scientific advisory

committees. FAC ¶ 31, JA____; Opp'n to Mot. to Dismiss Ex. 3 ¶ 15 Zarba

Decl."), JA____. Instead, EPA viewed participants in EPA-funded research as

leaders in their fields who often have valuable expertise that can contribute to the

integrity and rigor of peer reviews of science used by EPA. Zarba Decl. ¶¶ 18-19,

JA____.

In accordance with the uniform ethics rules, EPA allowed EPA grant

recipients to participate in matters of general applicability and precluded them

from participating only in those rare matters that might affect their employer in a

special and distinct way. FAC ¶ 34, JA____. Indeed, EPA had never before viewed

the receipt of EPA research funding as per se disqualifying from service on its

scientific advisory committees. *Id.* ¶¶ 36-38, JA___-___. Consistent with the

government-wide policy established in the uniform ethics rules that deemed

scientists receiving government research grants to be sufficiently independent to

14

offer scientific advice on subjects other than their grants, *id.* ¶ 39, JA____-__, EPA reviewed agency grant funding as part of its selection and oversight of advisory committee members. FAC ¶¶ 31-40, JA____-__. EPA required EPA grants to be disclosed on EPA Form 3110-48, both when an individual is under consideration for an appointment and on an ongoing basis.[3] FAC ¶ 32, JA____; Zarba Decl. ¶ 16, JA____. As described by a former EPA official who oversaw two statutory scientific advisory committees—the Science Advisory Board and the Clean Air Scientific Advisory Committee—EPA then applied federal ethics laws and regulations to identify any potential conflicts of interest or appearance of partiality that would make appointment to a committee problematic. FAC ¶ 33, JA____; Zarba Decl. ¶ 16-17, JA____-__.

EPA took the position that excluding its grantees from service on advisory committees would shrink the pool of potential advisors by disqualifying some of those most qualified to render expert scientific and technical advice. FAC ¶¶ 22, JA____; *see* Zarba Decl. ¶ 26-27, JA____-__. EPA grantees typically are academic scientists who conduct cutting-edge scientific and technical research highly relevant to the work of the committees and of EPA. FAC ¶ 23, JA____-__. They

_____

[3] Submission of Form 3110-48 is required by the Ethics in Government Act, and begins with an explanation of the executive-branch ethics rules applicable to members of EPA federal advisory committees.

15

are often leading experts in their fields and especially well-qualified to advise the agency. *Id.* ¶¶ 41-42, JA____; Zarba Decl. ¶ 19, JA____.

### D. The Directive Reverses Longstanding EPA Policy.

EPA did an abrupt about-face on October 31, 2017 by issuing the Directive, "a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant." FAC Ex. A at 1, JA____.[4]

In announcing the Directive, then-Administrator Pruitt claimed that science committee members should be prohibited from holding EPA grants to ensure "integrity in the process and that the scientists that are advising us are doing so with not any type of appearance of conflict." FAC ¶ 46, JA____. Representative Lamar Smith and Senator James Inhofe, invited by Pruitt to make remarks, claimed that EPA's science committees were controlled by people with conflicts of interest, based solely on scientists' research funding. FAC ¶¶ 49, 51, JA____-__; Gormley Decl. Ex. 2 at 4-5, JA____-__. Pruitt announced that the Directive required those scientists to "make a choice" between committee service and their research funding. FAC ¶ 48, JA____.

---

[4] The Directive contains other provisions not at issue in this case.

16

Despite the claim that the Directive is designed to guard against conflicts, neither the Directive nor the accompanying legal memorandum, FAC Ex. B ("Memorandum"), JA____, addresses the uniform ethics rules or EPA's longstanding adherence to the rules in making advisory committee appointments, ensuring advisory committee independence, and preventing conflicts of interest. The only mention consists of a statement that the Directive is "in addition to EPA's existing policies and legal requirements preventing conflicts of interest." Memorandum at 3, JA____. The Directive and Memorandum also say nothing at all about the risk that the Directive will impair EPA's ability to recruit advisory committee members with the specialized knowledge and expertise that will contribute to high quality peer review of the science underlying EPA actions.

EPA did not consult or obtain approval from the Ethics Office, FAC ¶ 140, JA____, despite Ethics Office regulations requiring that agencies obtain the "prior approval" of the Ethics Office before issuing ethics rules. 5 C.F.R. § 2638.602. Nor did EPA follow the procedures required for issuance of a supplemental agency ethics regulation, including submission to the Ethics Office for co-signature and co-issuance, publication in the Federal Register, and codification in the Code of Federal Regulations. *Id*. § 2635.105; FAC ¶ 67, JA____.

17

### E. Dismissal of Scientists.

Immediately upon the Directive's issuance, EPA staff began applying the Directive as a mandatory requirement applicable to both current and prospective members of EPA scientific advisory committees, resulting in the dismissal from EPA scientific advisory committees of a large number of academic scientists, including plaintiff Robyn Wilson and members of plaintiff professional organizations. FAC ¶¶ 57, 62-63, JA____-__; Wilson Decl. ¶¶ 21-27, JA____-__; Zarba Decl. ¶¶ 22-29, JA___-__; McConnell Decl. ¶ 12-20, JA___-__. As a result, the representation of academic experts on EPA advisory committees has dropped precipitously. FAC ¶ 64, JA____; Zarba Decl. ¶¶ 25-29, JA____-__; U.S. Government Accountability Office, EPA Advisory Committees: Improvements Needed for the Member Appointment Process at 22-25 (July 2019), available at https://www.gao.gov/assets/710/700171.pdf. The dismissal and ongoing disqualification of expert scientists receiving EPA grants shrinks the pool and impairs EPA's ability to recruit qualified scientists to serve on its committees, which, in turn, compromises the ability of the scientific advisory committees to provide high-quality scientific advice to the agency. FAC ¶¶ 158-59, JA____-__; Zarba Decl. ¶¶ 25-29, JA____-__; Avol Decl. ¶¶ 10-11, JA____.

The Clean Air Scientific Advisory Committee, one of the first scientific committees from which the agency dismissed EPA grantees, provides an example.

After EPA dismissed agency grantees from the Committee and from a Committee subpanel focused on the health harms of breathing airborne particle pollution, the Committee was left with insufficient expertise to do its job, as even the new Committee appointees have recognized.[5] Administrator Wheeler has now proposed to establish "a pool of subject matter expert consultants" that the chair of the Committee "will draw from as needed."[6] Administrator Wheeler's proposal to establish a pool of experts outside of the official scientific advisory committee framework confirms that even Mr. Wheeler recognizes that EPA's scientific advisory committee is no longer able to fulfill its critical scientific role.

## F. District Court Proceedings.

Because the Directive forced scientists to choose between their research grants and service on EPA scientific advisory committees, Scientists brought this challenge to the Directive in the U.S. District Court for the District of Columbia. The lawsuit claims that the the Directive is illegal because it is inconsistent with the binding, uniform executive-branch ethics rules, violates procedural requirements for supplementing those rules, and departs without explanation from

---

[5] See Comment from Dr. Mark Frampton to EPA (Dec. 10, 2018), available at https://yosemite.epa.gov/sab/sabproduct.nsf/E9B02B3DC858DC258525835F005F AC0A/$File/Preliminary+CASAC+PM+ISA+Comments-121018.pdf (visited August 13, 2019) (current Air Committee lacks the "expertise in many areas that is necessary to adequately advise the EPA").

[6] Letter From Administrator Wheeler to Anthony Cox (July 25, 2019), available at https://www.eenews.net/assets/2019/07/26/document_gw_11.pdf.

EPA's longstanding policy and practice of conforming its scientific advisory committee appointments and conflict-of-interest requirements to the ethics rules.

On February 12, 2019, the district court granted EPA's motion to dismiss. Mem. Op., JA____. At the outset, it held that Scientists satisfied the requirements of standing and ripeness, and that their interests are within the zone of interests protected by the ethics laws and regulations. Although it rejected EPA's argument that the Directive is not an ethics rule and acknowledged that the uniform ethics rules are binding on EPA both under the federal ethics statutes and the Committee Act, the court held that EPA can adopt stricter ethics requirements for appointment to its advisory committees. For similar reasons, the court held that EPA had no obligation to obtain the Ethics Office's prior approval or concurrence in issuing the Directive and even if it did, judicial review of the requirement to obtain such concurrence was precluded by language in another ethics regulation. The court upheld EPA's reversal in policy, finding that EPA sufficiently acknowledged the change merely by using the words "strengthen" and "improve," and that it adequately explained the change in vaguely alluding to potential interference with advisory committee independence, even though the agency never addressed its about-face. Based on the court's own conviction that EPA will still be able to recruit sufficient scientific expertise, the court held that statutes requiring EPA to make appointments based on scientific expertise were not violated. In direct

20

tension with the court's conclusion that those statutes apply, the court held the determination of whether EPA's decision is arbitrary and capricious to be committed to agency discretion by law and therefore not subject to judicial review under the Administrative Procedure Act.

## SUMMARY OF ARGUMENT

By making recipients of EPA research grants ineligible for service on EPA's scientific advisory committees, the Directive marks a sharp and unlawful departure from the uniform ethics rules and EPA's longstanding policy of heeding those rules. The ethics rules deem recipients of federal research grants eligible to serve on advisory committees as long as they do not participate in reviews of their own grants. The Directive takes the polar opposite position. In doing so, the Directive departs from the uniform ethics rules, which the ethics laws make binding to ensure agencies like EPA act in accordance with government-wide standards of ethical conduct.

The uniform ethics rules go beyond regulating the conduct of federal employees and scientists who serve on scientific advisory committees as special government employees. They also bind other federal agencies by prohibiting the adoption of inconsistent rules and by mandating adherence to Ethics Office procedures that govern the adoption of supplemental rules. Further, the regulations adopted by the General Services Administration to implement the Federal

21

Advisory Committee Act confirm that the uniform ethics rules regulate and constrain EPA when it recruits, screens, and appoints scientists to scientific advisory committees. EPA therefore lacks the authority to deviate unilaterally from the rules that constrain its conduct. The Directive runs afoul of the ethics rules and is contrary to law.

By adopting the Directive, which covers the same types of conflicts of interest as the ethics rules, but comes out differently, EPA violated procedural requirements that limit its authority to adopt ethics rules that supplement or differ from the uniform ethics rules. To ensure uniform ethics standards apply throughout the Executive Branch as required by the federal ethics statutes, the Ethics Office oversees any agency attempts to add to or deviate from the uniform rules. It must give prior approval to any ethics-related agency rule and co-issue any supplemental agency ethics rules, yet EPA never involved the Ethics Office in its issuance of the Directive. EPA's violation of these procedural requirements is subject to judicial review because the Ethics Office regulations impose no limit on review of the "prior approval" requirement and the Ethics Office lacks statutory authority to preclude review of agencies' violations of the supplemental regulation requirement.

The Directive upends EPA's longstanding policy of embedding the ethics rules into its policies, practices, and even the forms it uses to screen appointments

to and manage the operations of its scientific advisory committees. Yet EPA adopted it without any explicit acknowledgement that the Directive takes a 180-degree turn from the ethics rules and EPA's past policies. The Directive prohibits what EPA previously allowed and even actively sought—advice from leading experts who conduct cutting-edge, grant-funded research—without a rational explanation. Nor does it explain how the ethics rules have fallen short or address whether excluding EPA grantees will impair EPA's ability to recruit qualified experts and stay abreast of the latest scientific developments. EPA's undisclosed and unexplained about-face is arbitrary and capricious.

The district court found ample law to apply and reached the merits of both the claim that the Directive violates the ethics rules and that it arbitrarily reverses EPA's longstanding practice of embedding those rules into its advisory committee appointments and management, which Scientists asserted in Counts I, III, and IV of the Amended Complaint. FAC ¶¶ 124-34, 142-55, 156-60, JA____-__, ____-__, ____-__. The court nonetheless held that other claims under the same statutes and regulations are committed to agency discretion by law and unreviewable. Mem. Op. at 18-26, JA____-__. It did not need to reach this issue, and its ruling ignores the fact that Scientists do not challenge any particular appointments or the ultimate composition of any committee. Instead, their claim is predicated on EPA's

23

arbitrary and capricious reversal under statutes and regulations that the district court itself determined are binding on EPA and applicable to the Directive.

## STANDARD OF REVIEW

On appeal from an order of dismissal under Federal Rule of Civil Procedure 12(b), this Court's review is *de novo*. *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). A Rule 12(b)(6) motion "is generally viewed with disfavor and rarely granted," *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985), and the moving party has the burden of demonstrating that a plaintiff has failed to state a claim. *Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016). In deciding the motion, the Court must accept all of the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court must also construe the complaint "liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quotation omitted).

Judicial review of final agency action is authorized by the Administrative Procedure Act, which directs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or issued "without observance of procedure required by law." 5 U.S.C. §§ 704, 706. When a "statute's

24

language is plain, the sole function of the courts. . . is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (cleaned up). The "ultimate objective when interpreting a statute is to give effect to the intent of Congress." *Gordon v. Gouline*, 81 F.3d 235, 238 (D.C. Cir. 1996) (quoting *Spencer v. Brown*, 17 F.3d 368, 372 (Fed. Cir. 1994)).

Where Congress has conferred primary authority to implement and interpret a statute to another agency, no deference is due to EPA's interpretation of the statute. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Courts likewise afford no deference to EPA's interpretation of another agency's regulations; such deference is given to interpretations of the regulations by the agency that promulgated them. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).

EPA's action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), has not explained how its action comports with statutory requirements, *see Mountain Commc'ns, Inc. v. FCC*, 355 F.3d 644, 648-49 (D.C. Cir. 2004), or if the action is illogical or irrational, *Siegel v. SEC*, 592 F.3d 147, 161 (D.C. Cir. 2010). When EPA reverses itself, it must acknowledge the reversal and provide a reasoned explanation grounded in the statute and the record. *See FCC v. Fox Television Stations*, 556 U.S. 502 (2009). If the reversal contradicts prior factual findings and circumstances that underlay or

25

were engendered by the earlier agency decision, the agency must rationally explain its decision to disregard those facts and circumstances. *Id*. at 515-16; *see also Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

## ARGUMENT

### I. EPA Violated Federal Ethics Law By Adopting A Conflict-Of-Interest Rule Inconsistent With The Uniform Ethics Rules Issued By the Ethics Office For the Executive Branch.

The Directive violates the requirements of federal ethics law because it imposes a conflict-of-interest requirement on members of EPA scientific advisory committees that is inconsistent with the uniform and binding ethics standards established by the Ethics Office for the executive branch. Specifically, the Directive treats the receipt of EPA research grants as creating a disqualifying conflict of interest, when the ethics rules expressly deem such funding not to disqualify the recipient from service as a special government employee on a scientific advisory committee. The district court found no jurisdictional obstacle to deciding this claim, but erred in ruling against Scientists on the merits.

### A. The Directive Is Inconsistent with the Uniform Ethics Rules.

The ethics rules bind EPA in its management of scientific advisory committees under two overlappling statutes. First, pursuant to its statutory authority to issue "rules and regulations . . . pertaining to conflicts of interest and ethics in the executive branch," 5 U.S.C. App. 4 § 402(b)(1), the Ethics Office has

26

established "uniform" ethics rules applicable to all federal agencies, including EPA, which govern the conduct of special government employees on federal advisory committees. These rules are binding on other federal agencies, and the Ethics Office has the authority to ensure that the ethics rules of agencies like EPA are "not inconsistent" with the uniform federal standards. 5 C.F.R. § 2638.602; *see* 5 U.S.C. App. 4, § 402(b)(12) (Ethics Office charged with evaluating other agencies' rules to ensure consistency with its uniform rules).

Second, the General Services Administration confirmed that the uniform ethics rules are binding on federal agencies when they appoint members to and ensure the independence of federal advisory committees. 41 C.F.R. part 102-3, subpt. C, App A. Under the Committee Act regulations, agencies must "apply Federal ethics rules" to prospective members in the appointment process and review members' "interests and affiliations . . . for conformance" with the Ethics Office rules. *Id.*; 41 C.F.R. § 102-3.105(h).

As the district court correctly found, the Directive is "guided by ethics concerns." Mem. Op. at 14. Indeed, in announcing the Directive, then-Administrator Pruitt accused EPA scientific advisory committee members of having conflicts of interest. *Supra* at __. And the memorandum issued with the Directive claims that the new requirement is "in addition to EPA's existing policies

27

and legal requirements preventing conflicts of interest." Memorandum at 3,

JA____.

The Directive is inconsistent with the uniform conflict-of-interest rules

because it disqualifies individuals from service on scientific advisory committees

on the basis of a financial interest that the uniform standards establish is <u>not</u>

disqualifying. First, the uniform rules disqualify employees from participating in

only "particular matter[s]" in which they have financial interests, 5 C.F.R.

§ 2635.402(c), whereas the Directive bars EPA grantees from serving even where

the matter has no bearing on the grant. A potentially disqualifying "particular

matter" concerns the interests of specific people or discrete, identifiable classes of

people, such as an adjudicative proceeding, an application for a permit, a contract,

or a criminal charge. 5 C.F.R. § 2635.402(b)(3). It "does not extend to the

consideration or adoption of broad policy options that are directed to the interests

of a large and diverse group of persons." *Id.* But instead of requiring scientists to

disqualify themselves from discrete particular matters, as required under the

uniform rules and EPA's prior policy, the Directive bars EPA grantees from any

advisory service whatsoever, including matters involving purely scientific

questions; matters of universal, national, and regional scope; and matters that have

nothing to do with their grants.

28

Second, the uniform rules also direct that disqualification is required only when participation will have "a direct and predictable effect on" the interest. 5 C.F.R. § 2635.402(c). A direct and predictable effect requires a "close causal link" between the government action and the financial effect and a real, as opposed to a "speculative possibility that the matter will affect the financial interest." *Id.* § 2635.402(b)(1). Yet the Directive disqualifies scientists from advisory committee service without regard to whether there is <u>any</u> link between their financial interest and the work of the committee, let alone a "direct and predicable effect." Indeed, the Directive disqualifies <u>all</u> recipients of EPA grants without demonstrating a "close causal link" between the work of the advisory committees and the financial interests of <u>any</u> committee member.

As further confirmation that mere possession of an agency grant is <u>not</u> a grounds for disqualification under the uniform rules, the rules expressly address the situation where a federal advisory committee has a financial interest that may be affected by the work of the committee. On the ground that the risk of a conflict of interest from most committee activity is "too remote or too inconsequential to affect the integrity of the services of employees," 60 Fed. Reg. at 47,208, 47,220, JA____, ____, the rules permit members to serve as long as they do not participate in a particular matter that has a special and direct effect on them or their employer. 5 C.F.R. §§ 2635.402, 2640.203(g). The rules decidedly reject the notion that mere

29

possession of EPA grants is a conflict of interest that could undermine the

"integrity" of an advisory committee, the assertion made in the legal Memorandum

accompanying the Directive. Memorandum at 3, JA____. There is unquestionably

an inconsistency between the core of the Directive and the ethics rules.

### B. Federal Ethics Laws Mandate Uniformity.

The inconsistency between the Directive and the ethics rules is both

undeniable and, under the federal ethics laws and regulations, impermissible. The

district court erred by viewing the ethics rules as merely establishing a "floor" that

leaves individual agencies free to adopt different and conflicting rules, so long as

they are more stringent. Mem. Op. at 13, 15, JA____, ____. The plain language of

the applicable statutes and regulations and the Ethics Office's authoritative

interpretation of those authorities confirms that the opposite is the case.

Rather than "minimum" standards, the Ethics Office unequivocally issued

"uniform standards," 57 Fed. Reg. at 35,006 (emphasis added), JA____, and it has

repeatedly confirmed that it intended to require uniformity. *E.g.*, 61 Fed. Reg. at

66,835 (affirming "need for uniform exemptions for all executive branch

employees"), JA____; 61 Fed. Reg. 50,689, 50,690 (Sept. 27, 1996) ("The

Standards . . . set uniform ethical conduct standards applicable to all executive

branch personnel."); Mem. From Director Shaub to Designated Agency Ethics

Officials re: Technical Modification of 5 C.F.R. part 2640, LA-16-07 (Aug. 31,

30

2016) (Ethics Office's definition of "employee" intended to establish "uniform coverage"), JA____. In fact, in adopting the standards of conduct the Ethics Office specifically rejected changes requested by other federal agencies that would have "treat[ed the standards] as establishing a <u>floor on ethical standards rather than as setting uniform ethical standards</u> for application to all executive branch personnel." 57 Fed. Reg. at 35,009-10 (emphasis added), JA____-__. Rather than make the standards a mere floor, the Ethics Office affirmed that they establish uniform standards and that agencies cannot "negate or revoke" the determinations that the Ethics Office has made. *Id.* at 35,010, JA____.

The Ethics Office effectuated its intent to make the standards uniform in part by requiring agency ethics regulations to be consistent with "this part and this subchapter," without exception. 5 C.F.R. § 2638.602. The subchapter—Subchapter B, Government Ethics—contains both prohibitions and <u>provisions that define conduct as ethically permissible</u>, *e.g.*, 5 C.F.R. § 2640.203(g). To be consistent with these rules, EPA must prohibit what ethics rules prohibit, and allow what the rules allow. EPA cannot unilaterally decide to prohibit what the rules allow. Doing so would altogether undermine the uniformity of the regulations, and, in fact, would obliterate it.

Congress could easily have instructed the Ethics Office to establish "minimum" standards, but did not. Instead, Congress directed the Ethics Office to

31

provide "overall direction of executive branch policies related to preventing

conflicts of interest on the part of officers and employees of any executive agency"

and to issue "rules and regulations . . . [for] the executive branch," including

"uniform regulations" defining "the types of interests that are not so substantial as

to be deemed likely to affect" government integrity. 5 U.S.C. App. 4 § 402(b)(1),

(3); 18 U.S.C. § 208(d)(2)(B). Congress would not have directed the Office to

issue "uniform regulations" defining what interests do not create an ethics problem

if it intended to empower other agencies to disregard those determinations.

As a final confirmation, the circumstances of adoption of the federal ethics

statutes demonstrate that Congress intended for the Ethics Office to establish

standards that are truly uniform across the executive branch, not merely to

establish a floor. First, the legislative history makes clear that Congress struck a

careful and deliberate balance between the need to avoid conflicts of interest and

the importance of having talented individuals be able to serve on federal advisory

committees. S. Rep. No. 2213, 87th Cong., 2d Sess., at 6-7. Indeed, a

contemporaneous analysis by the Attorney General explains that the prior statutory

requirements were viewed as "unnecessarily severe" and "imped[ing] the

departments and agencies in the recruitment of experts for important work." Dep't

of Justice, Memorandum Regarding Conflict of Interest Provisions of Public Law

87-849, 28 Fed. Reg. 985 (Feb. 1, 1963), JA____. The statute was intended to

32

"help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is outside the Government." *Id.* Congress subsequently established the Ethics Office to oversee implementation because the earlier-existing body, the Civil Service Commission, had failed to achieve "uniformity" in implementation of the law. S. Rep. No. 95-170, 30 (1977).

Even then, "prior to [passage of the Ethics in Government Act of] 1989, the authority to promulgate regulations implementing . . . section 208(b)(2) resided in the individual agencies," 61 Fed. Reg. at 66,830, JA____, and this created a serious problem of "needless agency-by-agency disparities," according to a Presidential Commission convened by President George H.W. Bush. Report and Recommendations of the President's Commission on Federal Ethics Law Reform ("Report and Recommendations") at 94, JA____; Executive Order 12668, JA____. *See also* Report and Recommendations at 2 ("we cannot afford to have unreasonably restrictive requirements that discourage able citizens from entering public service."), 92 ("variation among agencies . . . affects the fundamental fairness of the executive branch ethics program as well as the public perception of it."), JA____, ____. To remedy the problem of "inconsistent rules, and varying interpretations [that] have contributed greatly to making compliance difficult," *id.* at 93, JA____, the Commission advised Congress to empower the Ethics Office to

33

promulgate "uniform regulations" defining "permitted and prohibited conduct." *Id.* at 6, 94, JA____, ____. Congress did so by adopting the Ethics Reform Act of 1989, "grant[ing] branchwide authority" to the Ethics Office. 61 Fed. Reg. at 66,830, JA____.[7]

### C. The Ethics Rules and the Directive Apply to Committee Appointments and the Financial Interests of Members.

The conflict between the Directive and the uniform ethics rules is particularly acute because both apply to EPA appointment decisions and the financial interests of committee members, while prescribing different obligations.

The ethics rules apply not only to individuals, but also to to EPA appointment decisions, both under the federal ethics statutes and under the Committee Act. Ethics Office regulations provide without exception that agency rules must be consistent with the uniform ethics rules, and create no exception for appointment policies. 5 C.F.R. § 2638.602; *see* 5 U.S.C. App. 4 § 402(b)(12). In addition, the General Services Administration has incorporated the executive-branch ethics rules into its Committee Act regulations to ensure advisory

---

[7] *See* H.R. No. 101-362 (Nov. 15, 1989), JA____-__ (publishing report of Bipartisan Task Force in lieu of committee report on the legislation); Report of the Bipartisan Task Force on Ethics on H.R. 3660, Government Ethics Reform Act of 1989, Congressional Record-House at H 9254/2, JA____-__ (statutory changes in the bill are from the President's ethics package); President George H.W. Bush, Statement on Signing the Ethics Reform Act of 1989, JA____ (Act is "based on . . . the recommendations of the President's Commission on Federal Ethics Law Reform").

34

committee members are independent and to guard against conflicts of interest and unethical conduct. 66 Fed. Reg. 37,728, 37,731 (July 19, 2001). The district court recognized that the ethics rules apply to special government employees serving on advisory committees, but again reasoned that they create a floor, i.e., that they require only avoidance of conflicts. Mem. Op. at 15, JA____. Like the ethics rules themselves, however, the Committee Act regulations are not so limited. They provide that committee members "are covered by" the Ethics Office regulations, 41 C.F.R. part 102-3, subpt. C, App A; direct agency heads to review members' "interests and affiliations . . . for conformance" with the ethics rules; and provide that agencies should "apply Federal ethics rules," including consulting with ethics officials, in making committee appointments. 41 C.F.R. § 102-3.105(h); 41 C.F.R. part 102-3, subpt. C, App A.

Like the ethics rules, the Directive applies to both EPA and individual committee members. The district court concluded that the Directive is an appointment policy that binds only EPA. Mem. Op. at 13-14, JA____-__. But the Directive establishes a requirement that is applicable to committee members on its face: "a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant." FAC Ex. A at 1, JA____. And the accompanying

35

Memorandum confirms that committee members, not just agency staff, must change their conduct, stating that "[federal advisory committee] <u>members</u> should avoid financial entanglements with EPA to the greatest extent possible," and that committee "[c]andidates"—not EPA staff—"must avoid any conflicts of interest." Memorandum at 2-3 (emphasis added), JA____-__.

Even if it were correct that the Directive does not impose a requirement on committee members on its face (though it does), that would not change the fact that EPA's <u>practice</u> was to require individual scientists to abandon their grants. Scientists' complaint alleges that the Directive's new requirement was applied as mandatory against current members of EPA's scientific advisory committees in the middle of their terms, FAC ¶ 109, JA____; declarations from an EPA official who implemented the Directive and scientists who were forced out provide further confirmation. Zarba Decl. ¶¶ 23-25, JA____; Wilson Decl. ¶¶ 21-22, JA____. Indeed, EPA's practice was to require individual scientists to "make a choice" between continued employment and their research. FAC ¶¶ 47-48, JA____; McConnell Decl. ¶15, JA____. In light of these well-pleaded allegations and supporting declarations, it was error for the court to conclude that the Directive imposed no requirement on advisory committee members. *Erickson*, 551 U.S. at 94 (at the motion to dismiss stage, court must accept all of the factual allegations in the complaint as true); *Browning*, 292 F.3d at 242 (court must construe the

36

complaint "liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged") (quotation omitted).

Furthermore, whether the Directive applies to committee members directly, or instead binds the EPA staff who manage the committees, it prohibits committee members from receiving grants just the same. To see why the distinction makes no difference, imagine an agency rule prohibiting the employment of any common stock owner on the ground that stock ownership creates a conflict of interest. Although such a policy may be "addressed to" the agency, Mem. Op. at 14, JA____, and could be labeled an "employment policy," those labels would not change the fact that it also imposes a requirement on employees, all of whom are forced to sell their stock or lose their jobs. So here. Because the Directive makes an EPA grant a disqualification for committee service, it forces committee members to abandon their research (or lose their positions). Regardless of how it is labeled, or to whom it is "addressed," the Directive imposes a new requirement on advisory committee members—one inconsistent with the uniform ethics rules.

Further, the Directive has been applied to remove members from advisory committees, and such removal is among the sanctions that can be imposed for violating the ethics rules. 5 U.S.C. App. 4 § 402(f)(2). While violations of the ethics rules can also lead to criminal sanctions and more severe civil sanctions, this distinction has little bearing on whether EPA has adopted an ethics standard that

37

prohibits what the ethics rules allow. The Ethics Office has adopted exemptions, including the ones that define government research grants as too remote and inconsequential to create a conflict of interest with respect to broad matters. While these exemptions provide a safe harbor from criminal and civil liability, they also codify the Ethics Office's <u>substantive</u> expert determination that EPA committee members' interest in agency grants does not constitute a disqualifying conflict of interest. 18 U.S.C. § 208(b)(2) & (d)(2); 5 C.F.R. § 2640.203(g); 60 Fed. Reg. at 47,208. EPA's contrary determination in the Directive is inconsistent with these provisions, regardless of whether it carries all of the same civil or criminal penalties.[8]

Finally, the Committee Act regulation that provides that advisory committee members serve at the pleasure of the appointing authority does not save the Directive from its inconsistency with the uniform ethics rules. 41 C.F.R. § 102-3.130(a). This regulation preserves EPA's ability to select specific individuals to serve on its advisory committees and to define the terms of service. But, as the district court correctly recognized, the discretion conferred by this regulation is limited by other laws and regulations; indeed, the regulation says so expressly. *Id*.

---

[8] In addition, it is not only the exemptions from section 208 liability, codified in part 2640, that apply uniformly to the entire executive branch; the standards of conduct in part 2635 apply uniformly as well, including the standards establishing that grant recipients may serve as advisory committee members. *Supra* at 10-13.

38

Further, this case challenges no particular appointments, nor the ultimate composition of any advisory committee. Instead, this case argues that EPA may not adopt an ethics requirement inconsistent with the uniform ethics rules. That EPA may decline to appoint particular scientists on other grounds does not mean EPA can dismiss or disqualify them on grounds that are unlawful.

## II.     EPA's Conflict-Of-Interest Rule Is Procedurally Defective.

### A. EPA Violated Federal Ethics Law by Promulgating a Conflict-of-Interest Rule Without Consulting the Ethics Office or Observing Required Procedures.

EPA also failed to comply with procedural requirements established by the Ethics Office to ensure that agency rules "regarding conflict of interest and ethical problems" are "consistent with and an effective supplement to the conflict of interest laws." 5 U.S.C. App. 4 § 402(b)(12). Ethics Office regulations require all federal agencies: (1) to obtain "the prior approval of the [Ethics Office]" before issuing any "ethics-related" regulation, 5 C.F.R. § 2638.602; Mem. From Don W. Fox to Designated Agency Officials, LA-11-07 (Oct. 31, 2011) at 2-3; and (2) to submit supplemental agency ethics rules to the Ethics Office for its concurrence and co-issuance, 5 C.F.R. § 2635.105. Even if the executive-branch ethics rules are viewed to set a floor, the obligation to comply with the prior approval and supplemental regulation requirements for standards that go beyond that floor would still apply.

39

The Directive triggers both the "prior approval" and supplemental regulation requirements, yet EPA failed to comply with either one. EPA was required to obtain the Ethics' Office prior approval because the Directive is plainly "ethics-related." 5 C.F.R. § 2638.602; LA-11-07 at 2-3. *See* 5 U.S.C. App. 4 § 402(b)(12). The ethics rules and the Directive address the very same issue—whether the receipt of EPA research funding disqualifies an individual from serving on EPA's scientific advisory committees—while coming to opposite conclusions. Both address ethics issues and potential conflicts of interest, purporting to guard against the risk that the financial interests of committee members will undermine the integrity and objectivity of the committees.

And because EPA itself claims that the Directive is "in addition to EPA's existing policies and legal requirements preventing conflicts of interest," Memorandum at 3, JA____—i.e., that it supplements the uniform ethics rules—the Directive was also required to be issued as a supplemental regulation. *See* 5 C.F.R. § 2635.105(a)(2). An Ethics Office Legal Advisory, LA-11-07, discusses this requirement in depth, and leaves no doubt that the supplemental regulation process is required for EPA to adopt an additional conflict-of-interest requirement. *See* generally LA-11-07 at 2-3 (agency policy that "expand[s] restrictions on agency employees" likely requires a supplemental regulation).

40

The same Ethics Office legal advisory also confirms that that the Committee Act does not excuse EPA from compliance with these procedural requirements. LA-11-07 at 2-3. As the Legal Advisory explains, agencies may issue ethics regulations independent of the Ethics Office only "[w]hen there is specific and direct congressional authority to issue ethics related regulations independent[ly]." *Id.* at 3. Further, even when such authority exists, the Ethics Office still "must concur that an ethics related regulation is appropriately promulgated separately within the agency's independent regulations." *Id.*

Moreover, EPA counsel conceded at oral argument that, if the Directive is an ethics rule, it must be issued though the supplemental regulation process.[9]

> <u>The district court</u>:          Yeah. I mean, I hear you. I've got to say, you know, those concerns about the appearance of impropriety, that sounds a lot like government ethics concerns; right? That sounds a lot like Section 208.

> <u>EPA counsel</u>:        Well, not exactly. I mean, Section 208 says, you know, What business are you in? What money are you receiving? And all that. This is more a question of, you know, how does the broader public perceive EPA and its advisory committees? So similar but, again, I think, distinct points

---

[9] Any argument to the contrary is waived. *Archdiocese v. WMATA*, 897 F.3d 314, 322 (D.C. Cir. 2018).

and ones that the agency is free to address separate and apart from the

ethical standards of the government ethics office.

\* \* \*

The district court:        If I disagreed with you and found that the directive

is a conflicts rule, would the ethics laws and regs apply then?

EPA counsel:        . . . if, indeed, you find it to be an ethics rule, then we

would need to comply with the ethics statutes and regulations. So

presumably, it would, then, need to be adopted through the supplemental

regulatory system that the [Ethics Office] operates and so forth.

Transcript of Hearing at 46-49 (Dec. 7, 2018).

As the district court correctly found, the Directive is driven by "ethics

concerns." Mem. Op. at 14, JA____. Therefore EPA was required to follow the

Ethics Office procedures to issue it, by EPA counsel's own account.

**B. Judicial Review of Whether EPA Acted in Violation of Required Procedures Is Not Precluded by an Ethics Office Regulation.**

The Administrative Procedure Act provides a cause of action for Scientists

to challenge EPA's failure to comply with the procedural requirements established

in the Ethics Office regulations. 5 C.F.R. §§ 2638.602 (requiring prior approval),

2635.105 (requiring issuance as a supplemental agency ethics regulation). *See*

5 U.S.C. §§ 701-706; *see also id.* 706(2)(D) (court shall "hold unlawful and set

aside agency action…without observance of procedure require by law"). Despite

42

this APA cause of action, the district court held that an Ethics Office regulation

precludes judicial review of Plaintiffs' claim. Mem. Op. at 16-18 (relying on

5 C.F.R. § 2635.106(c)), JA____-__.

At the outset, two separate regulations establish procedural prerequisites for

EPA to adopt ethics or conflict-of-interest rules, and nothing in the Ethics Office's

regulations could be construed to limit or preclude judicial review of EPA's

violation of the first of them—5 C.F.R. § 2638.602, requiring prior approval. The

regulation that allegedly precludes review refers to violations of part 2635, not the

part that contains the prior approval requirement, part 2638. 5 C.F.R.

§ 2635.106(c) ("A violation of [part 2635] does not create any right or

benefit…enforceable…against the United States"). Thus there can be no argument

that judicial review of EPA's failure to seek prior approval for the Directive is

precluded.

Even as to the requirement to follow the supplemental regulation process,

5 C.F.R. § 2635.105, the Ethics Office regulation cannot preclude APA review

because Congress never enacted any statute granting the Ethics Office authority to

preclude review. The Supreme Court has "long applied a strong presumption

favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish

& Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (cleaned up); *see also Bennett v.

Spear*, 520 U.S. 154, 175 (1997) (the APA cause of action "applies universally").

43

And under the binding precedent of this Circuit, "only statutes, not agency regulations" can preclude APA review. *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998). An agency "cannot adopt regulations erasing the presumption of reviewability embodied in the APA unless [the underlying statute] reveals <u>clear and convincing evidence</u> that Congress intended to foreclose judicial review." *Ball, Ball & Brosamer v. Reich*, 24 F.3d 1447, 1450-51 (D.C. Cir. 1994) (cleaned up) (emphasis added).

Here, there is <u>no</u> evidence, let alone clear and convincing evidence, that Congress empowered the Ethics Office to preclude APA review. *Compare Council for Urological Interests v. Sebelius*, 668 F.3d 704, 709 (D.C. Cir. 2011) (identifying text, structure, and legislative history as potential of evidence Congressional intent) *and De Jesus Ramirez*, 156 F.3d at 1276 (same) *with* Mem. Op. at 16-18 (failing to identify any evidence of Congressional intent), JA____-__. For example, nothing in the text or structure of the Ethics in Government Act suggests Congress authorized the Ethics Office to preclude APA review of another agency's failure to comply with Ethics Office regulations. *See generally* 5 U.S.C. App. 4 § 401 *et seq.* Indeed, the district court did not identify any statute that purportedly authorized the Ethics Office to preclude judicial review. *See* Mem. Op. at 16-18, JA____-__. In the absence of clear and convincing evidence that Congress authorized the Ethics Office to preclude APA review, its regulations

44

cannot preclude review of Scientists' claim. *PDR Network, LLC v. Carlton &
Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2060 (2019) ("Unless there is
persuasive reason to believe that Congress intended to preclude judicial review, the
Court will not preclude review." (cleaned up)).

    In reaching the opposite conclusion, the district court relied on an inapposite
decision governing the availability of APA review of an agency's failure to comply
with an <u>executive order</u>. Mem. Op. at 17 (citing *Air Transport Ass'n of Am. v.
FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999)), JA____. But this case involves a challenge
to a binding <u>regulation</u>; consequently, this Court's decisions in *Ball, Ball, &
Brosamer* and *De Jesus Ramirez*, not *Air Transport*, control. Here, the Ethics
Office promulgated the supplemental regulation procedures pursuant to its
statutory rulemaking authority, and those regulations became law upon
promulgation.[10] The Court "must give [the regulations] effect, as the court would
any law." *Kisor*, 139 S. Ct. at 2415. *See also* 5 U.S.C. § 706(2)(D); Wright &
Miller, 33 Fed. Prac. & Proc. Judicial Review § 8393 (2d ed.) (§ 706 of the APA
"instruct[s] courts to set aside agency actions infected by legal error").

---

[10] Congress delegated authority to the Ethics Office to promulgate "rules and
regulations" implementing the Ethics in Government Act. 5 U.S.C. App. 4 §§ 402,
404. The Ethics Office used this authority to promulgate the regulations requiring
prior approval and use of the supplemental regulation process. 46 Fed. Reg. 2582,
2583-84 (Jan. 9, 1981) (first promulgating "prior approval" requirement), JA____-
__; 57 Fed. Reg. at 35,006, 35,043-44 (promulgating supplemental regulation
procedures), JA____, ____-__.

III.    **EPA's Reversal in Policy is Arbitrary and Capricious.**

In addition to their claim that the Directive is in direct conflict with the uniform ethics rules and Ethics Office procedural requirements, Scientists also argued in Counts I, III, and IV that the Directive is arbitrary and capricious because EPA jettisoned the ethics rules and reversed its own consistent practice without a rational explanation or, indeed, any recognition that it was doing so. FAC ¶¶ 124-34, 142-55, 156-60, JA____-__, ____-__, ____-__. In deciding to disqualify grant-funded scientists from its scientific advisory committees, EPA inexplicably failed to consider that the Ethics Office has determined, in consultation with the Attorney General, that these grants do not create a disqualifying conflict; consider the risk that the Directive will impair EPA's ability to recruit needed expertise; acknowledge the reversal of its own prior policy; or address the facts and circumstances that underlay its prior position.

### A. EPA Failed to Consider The Ethics Office's Determination That Agency Grants Should Not Disqualify Scientists from Scientific Advisory Committee Service.

The expert determination of the Ethics Office that the risk of a conflict-of-interest from receipt of agency grants is "too remote or too inconsequential" to merit disqualification of grantees from federal advisory committees, *supra* at 29-30, is—at the very least—a "relevant factor" that EPA should have considered before adopting the Directive. *See New York Cross Harbor R.R. v. Surface Transp.*

46

*Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) (quoting *N. Mun. Distribs. Group v. FERC*, 165 F.3d 935, 941 (D.C. Cir. 1999)) (agency must consider "all relevant factors"); *Pacific Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1116 (D.C. Cir. 2002) (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968)) (agency must give reasoned consideration to "each of the pertinent factors"). Yet the Directive and Memorandum contain no acknowledgement of that contrary detemination. Indeed, the Directive and Memorandum evidence no awareness that EPA's new position contradicts the executive-branch ethics standards. Instead, the Memorandum claims that the Directive is "in addition to" existing conflict-of-interest policies, Memorandum at 3, JA____, when in fact it is at odds with them.

EPA's complete failure to acknowledge that its new position is contrary to the uniform executive-branch ethics standards and consequent failure to explain is arbitrary and capricious. *See U.S. Dep't of State v. Coombs*, 482 F.3d 577, 581 (D.C. Cir. 2007) (vacating and remanding agency decision that "[did] not appear to have even considered" whether particular course of action was reasonable "in light of" relevant law).

## B. EPA Failed to Consider The Risk that Barring EPA-Funded Scientists From Its Scientific Advisory Committees Will Impair Its Ability to Recruit Needed Expertise.

EPA also "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, by failing to address the risk that disqualifying

47

all scientists who conduct EPA-funded research will compromise its ability to recruit needed expertise. EPA itself previously concluded that disqualifying EPA grantees from the committees would exclude many of those most qualified to render expert scientific advice, FAC ¶ 22, JA____; *see* Zarba Decl. ¶¶ 26-27, JA____-__, and the Directive reaffirms that "it is in the public interest to select the most qualified, knowledgeable, and experienced candidates." Directive at 1, JA____. Despite this, the Directive and Memorandum give no consideration at all to the effect that disqualifying these scientists will have on EPA's ability to recruit the expertise it needs.

This is no peripheral concern. EPA's access to leading scientific experts is critical to its public health and environmental mission, and many of the statutes EPA administers require decisions to be made on the basis of the "best available science" or the "latest scientific knowledge." *E.g.*, 15 U.S.C. § 2625(h)-(i); 42 U.S.C. §§ 7408(a)(2), 7409(b). Indeed, some of the statutes authorizing EPA to establish and utilize scientific advisory committees require EPA to make appointments on the basis of expertise. *See* 42 U.S.C. § 4365(b); 7 U.S.C. § 136w(d). And the Committee Act itself requires EPA to ensure that its committees are "fairly balanced in terms of … the functions to be performed," 5 U.S.C. App. 2 § 5(b)(2), while its implementing regulations instruct EPA to "consider a cross-section of those . . . qualified, as appropriate to the nature and

48

functions of the advisory committee." 41 C.F.R. § 102-3.60(b)(3). And the federal

ethics statutes themselves are carefully crafted to enable agencies to recruit

necessary expertise. *Supra* at 9. *See*, *e.g.*, 18 U.S.C. § 208(b)(3). EPA's complete

failure to consider whether the Directive will impair its ability to recruit necessary

scientific expertise is arbitrary and capricious under these statutes.

In nevertheless upholding the Directive, the district court found as a factual

matter—based on nothing and contrary to the allegations in the complaint—that

"there remains a universe of qualified scientists, academics, physicians, and

experts" available to EPA who are "capable of conducting the scientific decision-

making EPA needs," "[e]ven under the Directive." Mem. Op. at 25, JA____. But

the district court should not have decided in the first instance what effect the

Directive will have on EPA's access to expertise. EPA never provided such a

rationale in adopting the Directive, and it was error for the court to uphold the

Directive based on "reasoning that appears nowhere in the agency's order."

*PanAmSat Corp. v. FCC*, 198 F.3d 890 (D.C. Cir. 1999) (cleaned up). It was also

incorrect for the court to credit its own views over the factual allegations in the

complaint—including that EPA grantees are often the most qualified scientists in

the subject-matter areas important to EPA's work, FAC ¶ 158, JA____, and that

excluding them will deprive EPA of needed expertise, FAC ¶¶ 120, 122, JA____-

49

___—and to draw inferences in EPA's favor on a motion to dismiss. *Browning*,

292 F.3d at 242.

Resolution of this claim must turn on the adequacy of <u>EPA's</u> evaluation of

the risk that the Directive will impair its ability to recruit the scientific expertise it

needs. Because EPA did not consider this risk at all, the Directive is arbitrary. *See*

*State Farm*, 463 U.S. at 43.

**C. EPA Failed to Acknowledge Its Own Prior Policy or Address the Reasons for it.**

EPA also failed to acknowledge that the Directive reverses its prior policy

and failed to address the basis for it grounded in the ethics rules. Before the

Directive, EPA's consistent, decades-long policy was to allow EPA grantees to

serve on scientific advisory committees, in accordance with the executive-branch

ethics rules, because they are unbiased and uniquely qualified. FAC ¶¶ 22-23, 31-

38, 41-42, 158, JA____-__, ____-__, ____, ____-__. In reversing course, EPA was

required to both "display awareness that it <u>is</u> changing position' and address "facts

and circumstances that underlay . . . the prior policy." *Fox*, 556 U.S. at 515-16.

Here, EPA did neither.

First, EPA failed to "display awareness" that it was changing its position. It

never even "acknowledged" that the Directive reversed EPA's prior policy and

practices. *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir.

2009) ("Reasoned decision making . . . requires the agency to acknowledge … its

50

departure from established precedent."). Nowhere in the Directive or Memorandum does EPA acknowledge that the decision to disqualify EPA grantees represents a complete 180-degree departure from its prior consistent policy. Indeed, EPA claimed that the Directive's disqualification of EPA grantees was "in addition to EPA's existing policies and legal requirements," Memorandum at 3, JA _____—a statement that seems to imply that prior policies and legal requirements were silent on this question, and certainly fails to acknowledge that they took the exact opposite position. Under this Court's precedent, when an agency's new policy represents a "fundamental departure from longstanding policy" it is "completely insufficient" for the agency merely to state its new policy. *CBS Corp. v. FCC*, 785 F.3d 699, 709 (D.C. Cir. 2015) (agency's express recognition it was "amending" a prior order was insufficient because agency "acknowledged nowhere…that the [amendment] depart[ed] from longstanding practice") (emphasis omitted). *See also Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 707 F.3d 371, 382 (D.C. Cir. 2013) (rejecting as arbitrary agency's "failure to grapple with the past").

EPA's claim that it sufficiently acknowledged its policy reversal by stating that the Directive "strengthen[s] and improve[s]" the committees is no different from the claim this Court has rejected: that an agency sufficiently "acknowledge[s] [its] departure—by departing." *CBS Corp.*, 785 F.3d at 709. Such vague statements

51

that fail even to _identify_ the policy being changed are a "far cry" from what

reasoned decision making requires: a forthright acknowledgement that the

Directive repudiates prior policy and practice. _Compare id. with_, _e.g._, _Nat'l Ass'n_

_of Home Builders v. EPA_, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (upholding

agency rulemaking which expressly stated it was "'eliminating' [prior] provision"

(emphasis added)); _Cablevision Sys. Corp. v. FCC_, 649 F.3d 695, 710 (D.C. Cir.

2011) (upholding agency action which expressly stated the agency was "'rejecting

[prior] view'" (emphasis added)).

   EPA also arbitrarily failed to grapple with the facts and circumstances that

underlay its prior policy, as required by _Fox_, 556 U.S. at 515-16. In reversing

course, EPA failed to rationally address its previous conclusion and that of

government-wide policy that EPA grantees can provide objective and unbiased

advice on matters unrelated to their grants. FAC ¶¶ 36-40, JA____-__. Indeed,

EPA does not even mention those conclusions, let alone explain why it no longer

believes them to be true. The Directive contains only a vague statement about

wanting to "strengthen and improve the independence" of the scientific advisory

committees without revealing what is changing and why. The accompanying

Memorandum merely states conclusions, declaring without elaboration that EPA

grants threaten the objectivity, integrity, reliability, and independence of EPA

committees. Neither explains how the executive-branch ethics rules have fallen

52

short, provides any evidence of past interference or even potential for or

appearance of interference with the integrity of the committees, or hints why

EPA's situation is different from that of every other agency to which the ethics

rules apply. EPA likewise failed entirely to address its prior conclusion that

disqualifying EPA grantees would exclude many of those most qualified to give

advice. FAC ¶ 22, JA____; *see* Zarba Decl. ¶ 26-27, JA____-__. EPA's reasoning

is arbitrary because its explanations are "conclusory," *Muwekma Ohlone Tribe v.*

*Salazar*, 708 F.3d 209, 220 (D.C. Cir. 2013), and because "[n]othing" in the

decision "sheds any light" on why EPA has disregarded the considerations that it

formerly, and consistently, thought important. *CBS Corp.*, 785 F.3d at 710.

**IV.     The Directive Is Reviewable, Not Committed to Agency Discretion By Law.**

Although EPA moved to dismiss on the ground that EPA has complete and

unreviewable discretion, *see* EPA Mem. in Supp. of Mot. to Dismiss at 26,

JA____; Mem. Op. at 5, JA____, the district court reached the merits of Scientists'

claim that the Directive violates the ethics laws and regulations, finding no

reviewability obstacle. The court accepted that the federal ethics statutes and

uniform regulations provide a meaningful standard for reviewing the Directive.

Mem Op. at 12-14, JA____-__; *see id.* at 14 (EPA's "discretion is not

unbounded"), JA____. The court also found that the Committee Act regulations

incorporating the ethics rules by reference provide such a meaningful standard

53

under the Committee Act, as do committee-authorizing statutes that require

committee members to be qualified to advise the agency. Mem. Op. at 14, 25,

JA____, ____.

The district court was correct in finding meaningful standards against which

to assess the lawfulness of the Directive in federal ethics laws, the Committee Act,

their implementing regulations, and the authorizing statutes. This is not one of

those rare instances where the matter is committed to agency discretion and

unreviewable. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410

(1971) (APA review is unavailable only "in those rare instances where 'statutes are

drawn in such broad terms that in a given case there is no law to apply.'"); *see* 5

U.S.C. § 701(a)(2). And it is well settled that regulations promulgated by an

agency in carrying out its statutory mandates also furnish law to apply for judicial

review. *CC Distribs., Inc. v. United States*, 883 F.2d 146, 154 (D.C. Cir. 1989).

The district court also ruled on the merits on Scientists' claim that the

Directive reverses EPA's longstanding policy without a rational explanation. In

doing so, it found law to apply under the federal ethics statutes, the Committee

Act, and their implementing regulations. Mem. Op. at 26-28, JA____-__. While

Scientists disagree with the district court's merits ruling, they agree that these laws

and regulations provide law to apply both in determining whether the Directive

expressly violates their terms and also whether EPA's reversal of its past policies

54

predicated on those laws and regulations was arbitrary and capricious. While EPA

certainly has an element of discretion to reverse policy, the existence of some

discretion does not insulate the agency from arbitrary and capricious review.

*Weyerhaeuser*, 139 S. Ct. at 371; *Dep't of Commerce v. New York*, 139 S. Ct.

2551, 2568-69 (2019). "[B]road discretion is not the same as unreviewable

discretion." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 495 (D.C. Cir.

1988).

    The district court nonetheless appeared to decide that Scientists' claim

challenging the Directive as arbitrary and capricious falls within the APA's narrow

exception to judicial review for matters committed to agency discretion by law.

Mem. Op. at 18-26, JA____-__. As an initial matter, it is difficult to reconcile this

ruling with the court's decision to review the policy reversal and uphold it as

rational. *Id.* at 27-28. JA____-__.

    The ruling also misapprehends the nature of Scientists' claim and what it

asks the Court to decide. Admittedly, EPA has the authority to appoint and remove

advisory committee members for a wide range of reasons. The General Services

Administration's regulation to that effect is unsurprising, but also unenlightening.

*See* 41 C.F.R. § 102-3.130(a) ("Unless otherwise provided by statute, Presidential

directive, or other establishment authority, advisory committee members serve at

the pleasure of the appointing authority or inviting authority. Membership terms

55

are at the sole discretion of the appointing or inviting authority."). But Scientists do not challenge the appointment of any individuals to any committees. This case challenges the Directive as being contrary to the ethics rules and an arbitrary reversal of EPA's past policies embodying and applying those rules. The court recognized that the ethics laws and Committee Act bind EPA in managing appointments to its advisory committees, Mem. Op. at 13-14, JA____-___, and also that EPA could not adopt the Directive in violation of the "explicit … requirements" of statutes that authorize the committees and establish criteria for appointments, *id.* at 23, 25, JA____, ____. It follows that these laws and regulations provide a meaningful standard for judicial review when EPA abandons its past policies predicated on them for reasons that are unexplained and arbitrary.

Nor do Scientists challenge the composition of any EPA committee. The district court therefore did not need to decide whether a court can review such a challenge under the Committee Act, and the bulk of its committed to discretion by law analysis is *dicta.* The district court embraced a concurrence in *Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods*, 886 F. 2d 419, 426-31 (D.C. Cir. 1989) (Silberman, J., concurring), which found a lack of meaningful standards to guide a court in determining which viewpoints deserve representation and whether viewpoints are fairly balanced. Mem. Op. at 19-20 ("the Court would need to make 'arbitrary judgments' about 'which organizations

56

or individuals qualify'") (quoting *Microbiological*, 886 F.2d at 428-29 (Silberman,

J., concurring)), JA____-__. Since Scientists do not ask the Court to determine

whether EPA's committees are balanced, but only to apply the familiar standards

of arbitrary and capricious review to EPA's policy reversal, this discussion is

inapposite.

With respect to EPA's failure to consider the risk that the Directive will

impair the expertise of the committees, the district court seemed to confine

Scientists to presenting claims that EPA violated "explicit statutory requirements."

Mem. Op. at 23, JA____. But "judicial review involves far more than just ensuring

that agencies act within their statutory authority." The Honorable David S. Tatel,

*The Administrative Process and the Rule of Environmental Law*, 34 Harv. Envtl. L.

Rev. 1, 5 (2010). The Court can also review whether EPA acted arbitrarily and

capriciously, even if the letter of the applicable statutes and regulations has not

been violated. 5 U.S.C. § 706(2)(A); *Dep't of Commerce v. New York*, 139 S. Ct.

2551, 2568-69 (2019) (when Congress places limits on agency discretion, review is

available "according to the general requirements of reasoned agency

decisionmaking").

## CONCLUSION

For the foregoing reasons, the Court should reverse the decision of the

district court and remand with instructions to vacate the Directive and grant other

57

appropriate relief.

DATED:        August 15, 2019               Respectfully submitted,

/s/ Michael Burger (w/permission)           /s/ Neil Gormley
Michael Burger                              Neil Gormley
Special Counsel                             Tosh Sagar
Columbia Environmental Law Clinic           Earthjustice
Morningside Heights Legal Services          1625 Massachusetts Ave., NW
435 W. 116th St.                            Suite 702
New York, NY 10027                          Washington, DC 20036-2243
(212) 854-2374                              (202) 667-4500
mburger@law.columbia.org                    ngormley@earthjustice.org
                                            tsagar@earthjustice.org

*Counsel for Appellants Joe Árvai and*
*Robyn Wilson*                              Patti Goldman
                                            Earthjustice
                                            705 Second Avenue
                                            Suite 203
                                            Seattle, WA 98104
                                            (206) 343-7340
                                            pgoldman@earthjustice.org

                                            *Counsel for Appellants Physicians for*
                                            *Social Responsibility, National*
                                            *Hispanic Medical Association,*
                                            *International Society for Children's*
                                            *Health and the Environment, and*
                                            *Edward Lawrence Avol*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i), that the foregoing **Proof Opening Of Appellants** contains 12,998 words, as counted by counsel's word processing system, and thus complies with the 13,000 word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

DATED: August 15, 2019

/s/ Neil Gormley
Neil Gormley

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2019, I have served the

foregoing **Proof Opening Brief Of Appellants** on all registered counsel through

the Court's electronic filing system (ECF).


/s/ Neil Gormley
Neil Gormley